UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| Carol Z., | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | Case No. 19 CV 50134 |
| v. | ) | |
| | ) | Magistrate Judge Lisa A. Jensen |
| Andrew Marshall Saul, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| *Defendant*. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Carol Z. brings this action under 42 U.S.C. § 405(g) seeking reversal or a remand of the decision denying her disability insurance benefits and supplemental security income. The parties have consented to the jurisdiction of a United States Magistrate Judge for all proceedings pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the Commissioner's decision is reversed, and this case is remanded for further proceedings consistent with this Memorandum Opinion and Order.

**I. Background**[1]

This Social Security disability benefits case, which is now long running with a large administrative record, is before the Court a second time. Plaintiff submitted applications for disability insurance benefits and supplemental security income on September 25, 2013, when she was 37 years old. Plaintiff alleged that she suffered from diabetes, carpel tunnel in both hands, anxiety, high blood pressure, and blood sugar problems with an alleged onset date of August 1, 2013.

---
[1] The following facts are only an overview of the medical evidence provided in the administrative record.

1

Plaintiff's claims were initially denied on January 2, 2014, and upon reconsideration on June 27, 2014. After a written request for a hearing, the Administrative Law Judge ("ALJ") held a video hearing on October 25, 2015. On November 27, 2015, the ALJ issued an unfavorable decision finding Plaintiff was not disabled. Plaintiff then filed a request for review of the hearing decision with the Appeals Council, who denied review on December 23, 2016. On February 22, 2017, Plaintiff filed a complaint with the Court requesting judicial review of the Commissioner's adverse decision.

On November 20, 2017, the Commissioner filed a motion to remand for a new hearing and decision so that the agency could further evaluate the evidence of peripheral neuropathy. On November 21, 2017, the Court granted the motion and remanded the Commissioner's decision for further administrative proceedings. On December 20, 2017, the Appeals Council remanded the case, directing the ALJ to address and resolve a list of issues. Pursuant to the Appeals Council's order, the ALJ was directed to: re-evaluate whether Plaintiff has a medically determinable severe impairment of peripheral neuropathy at Step 2; obtain evidence from a medical expert; give further consideration to Plaintiff's maximum residual functional capacity ("RFC") during the entire period at issue and provide rationale with specific references to the record in support of assessed limitations, as well as evaluate treating source opinions and explain the weight given to such evidence; give further consideration to whether Plaintiff has past relevant work and whether she can perform it, as well as obtain vocational expert ("VE") evidence to assist in the evaluation; and obtain supplemental evidence from a VE to clarify the effect of assessed limitations on Plaintiff's occupational base.

On January 10, 2019, Plaintiff, represented by an attorney, testified at a second hearing before the ALJ. The ALJ also heard testimony from Dr. Ronald Semerdjian, a medical expert ("ME"), and Jill Radke, a VE.

At the time of this most recent hearing, Plaintiff was 42 years old. Plaintiff testified that she lived with her 17-year-old son, but that he would be moving out when he turned 18. R. 916. With respect to her neuropathy, Plaintiff stated that she was able to stand about 15-20 minutes at a time because of the tingling and burning in her legs and feet. R. 913. She also testified that, due to the pain, she was only able to walk about 30-40 steps at a time. R. 913. Plaintiff explained that she had also been wearing wrist splints for years as a result of the pain in her wrists. R. 911. She stated that, since the last hearing before the ALJ, her wrist pain had gotten worse and the problems with her wrists and hands resulted in her dropping things more often. R. 912, 918. Plaintiff also testified that, since the last time she was before the ALJ, she sleeps more because she is in a lot of pain. R. 918. She explained that the only way she could sleep is by taking a sleeping pill, and that she tried to sleep as much as possible, including during the day. R. 919.

During the hearing, the ALJ asked one question about Plaintiff's insulin-dependent diabetes mellitus[2], which the record shows she was diagnosed with at the age of seven. R. 703. When asked whether her insulin pump was controlling her blood sugar, Plaintiff testified that she has good and bad days with it. R. 918-919. She explained that since she started using the insulin pump, she has not had any incidents that resulted in her going to the hospital. R. 919. However, she indicated that on 5-7 occasions in the last year her blood sugar level has exceeded a level that was measurable by the pump's blood sugar monitor, which required her to "manually pump" in order to get her blood sugar down and avoid going to the hospital. R. 919.

---

[2] Plaintiff's endocrinologist also refers to Plaintiff's diabetes as "Type 1 diabetes mellitus with microvascular complications." R. 1500.

3

Plaintiff testified that the medications she takes for diabetic neuropathy are Hydrocodone for pain, Gabapentin, and another medication. R. 915. She explained that the Gabapentin did not relieve her neuropathy, but she took it because it was prescribed to her. R. 915. She indicated that the doctors were starting to wean her off the pain pills out of concern that she would go through withdrawals when she did not truly need the medication. R. 913, 916. Plaintiff explained that she has been prescribed another medication in the past, but she was unable to fill the prescription because "public aid [wouldn't] cover it." R. 916. Plaintiff testified that she used a cane "pretty much all the time." R. 917. She stated that she used the cane because she had "fallen one too many times" and Dr. Parveen told her it would be best to have a cane. R. 917.

Dr. Semerdjian testified that Plaintiff previously had right carpal tunnel syndrome, but currently only had mild left carpal tunnel. R. 931. In relation to Plaintiff's neuropathy diagnosis, he questioned why Plaintiff was told she had peripheral neuropathy in 2013 and was subsequently treated for it, despite what he determined was a lack of evidence. R. 926, 941. Dr. Semerdjian concluded that there was evidence to show Plaintiff currently has peripheral neuropathy with the first objective evidence of it in the record being from October 2018. R. 930-931, 933. When asked by the ALJ whether Plaintiff met or equaled a listing, Dr. Semerdjian indicated that he did not think she would meet or equal any listings. R. 934.

As for Plaintiff's limitations, Dr. Semerdjian opined that Plaintiff could sit for six hours and stand and/or walk for six hours. R. 936. He stated she could lift 20 pounds occasionally, and 10 pounds frequently. R. 936. He testified that, due to the carpal tunnel syndrome, he would limit Plaintiff to frequent fine and gross movements of both hands. R. 936. When asked about postural limitations, Dr. Semerdjian stated "I would place those at frequent. Crouched and crawl – same

thing. Well, I don't know if there's any need for ladders, scaffolds, and unprotected heights. If there were, I would put it at occasional." R. 936-37.

The ALJ ultimately denied Plaintiff's request for benefits. The ALJ found that Plaintiff had the following severe impairments: insulin dependent diabetes mellitus (IDDM), with possible neuropathy (no objective evidence until October 8, 2018); bilateral carpal tunnel syndrome, status post right-sided carpal tunnel release on right, mild carpal tunnel findings on left; and obesity. The ALJ determined that Plaintiff's impairments did not meet or medically equal the severity of a listed impairment. The ALJ concluded that Plaintiff had the RFC to perform light work, except Plaintiff could occasionally stoop, crawl, climb, crouch, and kneel; could frequently grasp and perform fine manipulations bilaterally; could occasionally use vibratory tools; and should avoid concentrated exposure to unprotected heights and moving, hazardous machinery.

## II. Standard of Review

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. *Id*. Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399–401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

However, the Seventh Circuit has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (a "mere scintilla" is not substantial evidence). A reviewing court must conduct a critical review of the evidence before affirming the

Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Moreover, federal courts cannot build a logical bridge on behalf of the ALJ. *See Mason v. Colvin*, No. 13 C 2993, 2014 WL 5475480, at *5-7 (N.D. Ill. Oct. 29, 2014).

### III. Discussion

Plaintiff raises four main arguments: 1) the ALJ's RFC was not supported by substantial evidence; 2) the ALJ erred in evaluating the opinion evidence; 3) the ALJ's subjective symptom assessment was flawed; and 4) the ALJ erred in precluding rebuttal evidence from Dr. Parikh into the record. Because this Court finds that the ALJ erred in evaluating the opinion evidence, the other issues will not be addressed.

**Weight Given to Dr. Parikh's Opinions**

Plaintiff argues that the ALJ failed to give appropriate weight to the opinions of her treating primary care physician, Dr. Ruchi Parikh. Dr. Parikh provided three Residual Functional Capacity questionnaires which addressed her opinions concerning Plaintiff's functional capacity from 2014 through 2018. R. 738-742, 857-861, 1205-1209. In September of 2014, Dr. Parikh opined that Plaintiff would be able to walk less than a block without stopping, could only sit two hours total in an 8-hour day and could stand/walk an equivalent amount. In addition, Plaintiff would need unscheduled breaks every fifteen to twenty minutes for ten minutes and reported Plaintiff would need to elevate her feet to 90 degrees two hours per day. Moreover, Plaintiff could never lift more than 10 pounds and could only use the left extremity to twist and manipulate and reach 10% or less of the workday. Plaintiff would be absent four workdays a

6

month. R. 738-742. Dr. Parikh's RFC questionnaires provided for similar limitations in 2015 and 2018.

"For claims filed before March 2017, a treating physician's opinion on the nature and severity of a medical condition is entitled to controlling weight if it is well-supported by medical findings and consistent with substantial evidence in the record." *Johnson v. Berryhill*, 754 F. App'x 247, 250 (7th Cir. 2018) (citing 20 C.F.R. 404.1527(c)(2)). A treating physician has "greater familiarity with the claimant's condition and circumstances," and therefore an ALJ may only discount a treating physician's opinions based on good reasons "supported by substantial evidence in the record." *See Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010); *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).

The ALJ found that Dr. Parikh's opinions were not entitled to controlling weight. In support of her conclusion, she stated that Dr. Parikh's limitations were excessive and inconsistent with the longitudinal record, "particularly in light of the generally normal examination findings, with periodic findings of reduced sensation, but no consistent gait, reflex, or strength restrictions." R. 890. The ALJ listed several examples, which the Court groups into four main points.

First, the ALJ stated that there was nothing to suggest significant lower extremity limitations, the need to elevate the legs, or the likelihood of unexpected absences documented in the record. R. 890. However, the ALJ seems to arrive at this conclusion by ignoring a considerable portion of Plaintiff's history with lower extremity issues. In October 2013, Dr. Parikh's treatment notes indicated that Plaintiff was able to ambulate, but required frequent breaks, that Plaintiff had bilateral ankle stiffness and a limited range of motion in the ankles, and that Plaintiff complained of worsening bilateral leg pain that felt like pins and needles. R. 591. Between November 2012 and February 2014, Plaintiff's treatment notes included references to ulcers, sores, lesions, and

7

rashes on the bilateral lower extremities that Dr. Parikh noted were possibly related to neuropathy. R. 360, 369, 370, 477, 489, 491, 501, 514, 528, 536, 618, 623-624, 723, 863. In February 2014, Dr. Parikh noted Plaintiff's loss of pinprick sensation on the lower extremities, pain and numbness with a "glove and stocking" distribution, and faint pedal pulses. R. 614, 616, 622. Dr. Parikh also issued Plaintiff a handicap sticker for her car due to Plaintiff's difficulty walking, especially in cold weather. R. 623. Also, in February 2014, Dr. Parveen, Plaintiff's endocrinologist, in assessing Plaintiff's ambulation, noted a reduced heel-to-toe transition, reduced range of motion in the ankles, and a report of severe lower extremity pain. R. 863-864. Between April and November 2014, Dr. Parveen noted Plaintiff's complaints of ongoing tingling in the bilateral legs. R. 704, 752. In August 2015, treatment notes indicated Plaintiff's numbness and tingling were "still active." R. 828. Between May 2016 and February 2018, Dr. Parveen conducted foot exams during each appointment, and consistently found that Plaintiff had an impaired vibration sense. R. 1548, 1556, 1565, 1574, 1584, 1593. In March 2018, Plaintiff's neurologist, Dr. Collins, observed absent ankle reflexes bilaterally, that Plaintiff felt a pinprick about 70% less in the legs than in the arms, had decreased vibration sense, that Plaintiff had difficulty standing with her eyes closed, that Plaintiff walked only "reasonably" well, and had decreased muscle bulk in the lower extremities.[3] R. 1607-1608. Notably, throughout this time period, Plaintiff experienced at least three falls. R. 369, 849, 1503. Furthermore, Plaintiff was consistently being treated for neuropathic pain in her lower extremities. R. 537, 539, 544, 607, 616, 630, 704, 782, 785, 1548, 1608, 1660. By failing to account for these numerous and relevant considerations presented throughout the record, the ALJ has not set forth good reasons to support the conclusion that there is "nothing" to suggest lower extremity limitations.

---

[3] This is in sharp contrast to the ALJ's statement that Dr. Collins' March 2018 physical examination of Plaintiff was "near normal." R. 891

As a second example, the ALJ stated that there were "no findings, such as a lower back condition, which would reasonably explain Dr. Parikh's statement that claimant would not be able to sit more than two hours a day." R. 890. The ALJ reasoned against a 2-hour sitting limitation by pointing out that Plaintiff was able to sit comfortably during her hour-long hearing without any apparent discomfort. R. 890. However, the ALJ's use of what has been referred to as the "sit and squirm" test is not substantial evidence in this Court's opinion. *See Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000). The Seventh Circuit has stated that they are uncomfortable with its use, and many other courts have condemned its use, as well. *See Powers*, 207 F.3d at 436 ("We doubt the probative value of any evidence that can be so easily manipulated as watching whether someone *acts* like they are in discomfort."); *Miller v. Sullivan*, 953 F.2d 417 (8th Cir. 1992); *Myers v. Sullivan*, 916 F.2d 659 (11th Cir.1990); *Jenkins v. Sullivan*, 906 F.2d 107 (4th Cir. 1990); *Lovelace v. Bowen*, 813 F.2d 55 (5th Cir. 1987).

The third set of examples the ALJ relied upon to support her refusal to give Dr. Parikh's opinion controlling weight related to Plaintiff's upper extremities. The ALJ noted that Dr. Parikh assessed an extreme loss of function in the left upper extremity although "nerve conduction studies indicated at most mild carpal tunnel syndrome" in the left upper extremity. R. 890. However, the ALJ again overlooked significant record evidence. For example, in June of 2017 orthopedic surgeon Dr. Bear noted that Plaintiff had reduced grip strength on the left, positive Tinel's sign [4] for the left wrist and elbow, and positive flexion compression and Finkelstein tests.[5] R. 1211, 1215. With respect to the right upper extremity, the ALJ noted that "Dr. Parikh also suggested that right

---

[4] Doctors use Tinel's sign tests to check for nerve problems, and it is commonly used to diagnose carpal tunnel syndrome. *See* Tinel's Sign, https://www.healthline.com/health/tinels-sign.

[5] The Finkelstein test is used to diagnose De Quervain's disease, which is commonly associated with the repetitive motions that place stress on the wrist. *See* Finkelstein sign, https://www.ncbi.nlm.nih.gov/books/NBK539768/.

9

arm function was reduced by ten percent in reaching, handling and fingering, however, there is no objective evidence to show that the claimant's carpal tunnel release surgery failed to restore function…" R. 890. However, there was evidence that full function was not restored and the ALJ again chose to ignore it. In June of 2017, Dr. Bear noted that the right extremity had reduced grip strength and reduced hand intrinsic strength. At that appointment, Plaintiff had a positive Tinel's sign in the wrist and elbow and a positive Finkelstein test. R. 1210. Additionally, although the flexion compression test and carpal tunnel compression tests were negative, the doctor noted that they caused paresthesia in an ulnar nerve distribution. She had positive index finger triggering, as well as a palpable nodule noted over the flexor tendon of the index finger at the level of the A1 pulley. R. 1210. Moreover, the record indicates that Plaintiff has worn wrist splints/braces consistently from the alleged onset date through the date of the hearing, and that Dr. Bear had recommended she wear a splint in October 2013 and again in 2017. R. 562, 663, 674, 693, 707, 838, 921, 1217, 1507, 1523, 1531. 1215. Plaintiff was diagnosed with radial styloid tenosynovitis bilaterally and was recommended to wear a thumb spica splint for both wrists. She declined an injection to alleviate her pain because a past trigger finger injection had resulted in hospitalization due to the increased insulin levels. R. 1215. Finally, Plaintiff's reports of tingling, numbness and pain in the hands and arms is consistent throughout her appointments with her various doctors beginning in February 2013. R. 501, 510, 521, 528, 599, 661, 676, 691, 705, 752, 782, 1210, 1505, 1521, 1538, 1546, 1554, 1562, 1571, 1581, 1590. Given all of this information, and the fact that the ALJ fails to even mention most of it in her decision, the Court finds that the ALJ has not supported her assessment of Dr. Parikh's opinions concerning Plaintiff's upper extremities with substantial evidence.

Fourth, the ALJ stated there were "internal inconsistencies" in Dr. Parikh's notations including whether Plaintiff required the use of a cane. R. 890. The ALJ specifically took issue with the fact that, on the first RFC questionnaire Dr. Parikh wrote that Plaintiff did not need a cane for ambulation but did need a cane to climb stairs. R. 890. The RFC questionnaire asks whether the patient must use a cane or other assistive device "[w]hile engaging in *occasional* standing/walking." R. 740 (emphasis added). Therefore, answering "no" to this question is not inconsistent with an answer indicating Plaintiff could only climb stairs with a cane. Furthermore, the Court is troubled by the ALJ's failure to mention how Plaintiff's falls (of which there were at least three noted in the record) could have influenced the recommendation to use a cane. Plaintiff's first fall down the stairs occurred about a year and a half before Dr. Parikh filled out the first RFC questionnaire. R. 369. Given this context, it makes sense why Dr. Parikh filled out the RFC questionnaire indicating Plaintiff needed a cane for stairs. When Dr. Parikh filled out the questionnaire in 2015, Plaintiff had now fallen twice, injuring her ankle the second time, which is consistent with the recommended use of a cane for occasional standing and walking, as well as for climbing stairs. R. 849, 859-60, 1261. In February 2018, Plaintiff had another fall, and Dr. Parveen observed a laceration on her right foot up to her knee. R. 1503. Therefore, when Dr. Parikh filled out the questionnaire again in May 2018, her recommended use of a cane was still consistent with her knowledge of Plaintiff's recurrent falls. R. 1207. As a result, the Court determines that the ALJ's finding of inconsistency on this matter is not supported by substantial evidence.

Finally, to support her conclusion that Dr. Parikh's opinions were not entitled to controlling weight, the ALJ stated that Plaintiff had generally normal examination findings and provided several examples. However, these examples were "cherry-picked" from the record, while completely ignoring other key aspects of Plaintiff's medical history, as noted in the long

11

paragraphs above. "An ALJ cannot rely only on the evidence that supports her opinion." *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013) (citation omitted). As a result, based on a review of the ALJ's examples along with the rest of the record, the Court finds the ALJ failed to consider key evidence in the record and consider the context as a whole in reaching her conclusion that Dr. Parikh's opinions were not entitled to controlling weight.

The Commissioner argues that the ALJ "reasonably concluded that Dr. Parikh's assessment appeared to be based, in part, upon [P]laintiff's subjective reports." Response at 9-10, Dkt. 26. In support of this argument, the Commissioner cites to several Seventh Circuit cases that indicate a treating physician's opinion should not be based entirely on a claimant's subjective allegations. *See Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008); *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004); *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). The Commissioner is correct that a treating physician's opinion must be based on more than subjective complaints. However, the Commissioner himself characterizes Dr. Parikh's assessment as based "in part" on Plaintiff's subjective reports, which acknowledges that the opinion is not based solely on subjective complaints. Some examples of the objective evidence that supports Dr. Parikh's assessment (and which the ALJ ignored) include the impaired vibration sense in Plaintiff's feet, the positive Tinel's sign and Finkelstein tests in Plaintiff's upper extremities, Plaintiff's reduced range of motion in her lower extremities, and the lower extremity ulcers and lesions observed by numerous doctors for an extended period of time.

Even if there was sound reason not to give Dr. Parikh's opinions controlling weight, the ALJ still erred in failing to consider the relevant checklist factors.[6] If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider certain

---

[6] This two-step process is commonly referred to as the treating physician rule.

12

checklist factors in order to determine exactly how much weight to give the opinion. Those factors include the following: the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, the consistency and supportability of the physician's opinion, and other factors which tend to support or contradict the medical opinion. *See Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (citing 20 C.F.R. § 404.1527(c)(2)). There are two distinct lines of cases in the Seventh Circuit: one that requires an explicit analysis of each checklist factor and one that allows an implicit analysis. *See Duran v. Colvin*, No. 13CV50316, 2015 WL 4640877, at *8–10 (N.D. Ill. Aug. 4, 2015) (describing the two lines of cases). In this Court's view, the failure to explicitly analyze each checklist factor is itself a ground for a remand. *See Jason H. v. Saul*, No. 18 CV 50062, 2019 WL 3857879, at *5 (N.D. Ill. Aug. 16, 2019).

The ALJ was aware of the factors that the Social Security regulations require her to consider, as she listed them in her decision, yet she only addresses one and then only briefly. Immediately before launching into examples of why she found Dr. Parikh's limitations excessive and inconsistent with the record, the ALJ references the "longitudinal relationship" between the doctor and Plaintiff. R. 890. The ALJ is correct to acknowledge Plaintiff and Dr. Parikh's longitudinal relationship, since Plaintiff has been treated by Dr. Parikh since October 2013. R. 546. However, the ALJ failed to discuss how she factored this longitudinal relationship into her analysis of the weight to give to Dr. Parikh's opinions. Moreover, the ALJ did not address any of the other factors, such as the nature and extent of the treatment relationship, the frequency of examination, and the consistency and supportability of Dr. Parikh's opinion. Examining these factors may well have supported giving greater weight to Dr. Parikh's opinion.

13

Regarding the nature and extent of the treatment relationship, Dr. Parikh treated Plaintiff for her neuropathic symptoms with various medications including Hydrocodone, Zolpidem, Amitriptyline, and Gabapentin. R. 1174, 1620. Dr. Parikh also considered other doctors' examinations in her treatment of Plaintiff. R. 623, 1650, 1657. *See* 20 C.F.R. § 404.1527(c)(2)(ii) ("Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion."). This factor weighs in favor of giving greater weight to Dr. Parikh's opinions, yet the ALJ failed to address it.

The ALJ did not address the frequency of Dr. Parikh's treatment of Plaintiff. According to the record, Dr. Parikh started out seeing Plaintiff about two to three times per year and, over time, increased to seeing her for monthly appointments. R. 1205, 857, 738. The record seems to support a substantial treatment relationship. The ALJ did not address how, if at all, she factored this information into her determination. *See* 20 C.F.R. § 404.1527(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."). The frequency of Plaintiff's visits with Dr. Parikh's should be evaluated on remand.

The ALJ also failed to consider other factors that could support Dr. Parikh's medical opinion. *See* 20 C.F.R. § 404.1527(c)(6) ("When we consider how much weight to give to a medical opinion, we will also consider any factors . . . which tend to support or contradict the medical opinion. For example, . . . the extent to which a medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion."). In addition to Dr. Parikh's treatment of Plaintiff, Dr. Parikh's notes show that she was also aware of the treatment Plaintiff was receiving from Dr. Parveen and Dr.

14

Bear, indicating that she was familiar with the other information in Plaintiff's case record. *See* R. 750, 1619, 1639, 1670.

The ALJ's error with respect to the treating physician rule was compounded by the fact that she accorded "considerable weight" to the state agency medical consultants' assessments, which were conducted as recently as 2014. R. 97-153. Because these assessments were nearly 5 years old at the time of the ALJ's second hearing in 2019, they do not include over 5 years' worth of medical records and information. Examples of significant findings not reviewed by the state agency medical examiners include positive upper extremity findings from Dr. Bear in 2017, positive lower extremity findings from neurologist Dr. Collins in 2018 and positive monofilament testing in 2018.

In light of the above issues, the Court finds that a remand is warranted. In remanding this case, this Court is not suggesting that the ALJ as required to reach a particular conclusion. The Court recognizes that there is conflicting evidence, but this is even more reason why it is imperative to evaluate all of the evidence and to properly apply the treating physician rule. On remand, the ALJ shall address each step of the treating physician rule. If the ALJ properly determines that Dr. Parikh's opinions do not deserve controlling weight, then the ALJ must consider the checklist factors under 20 C.F.R. § 404.1527(c) to determine what weight to give to the opinion.

**CONCLUSION**

For the foregoing reasons, Plaintiff's motion for summary judgment is granted, the Commissioner's motion is denied, and the case is reversed and remanded for further proceedings consistent with this opinion.

Date: November 24, 2020        By: _____
                                                      Lisa A. Jensen
                                                      United States Magistrate Judge